UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PRINCOLA SHIELDS Estate of, by Debra Shields as Personal Representative, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:16-cv-02148-SEB-MJD |
| BRUCE LEMMON, Commissioner, et al. | ) ) | |
| Defendants. | ) | |

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs in this cause, The Estate of Princola Shields ("the Estate") and Princola's

mother, Debra Shields, filed suit against the Indiana Department of Corrections

("IDOC") and Corizon Health, Inc. ("Corizon") as well as various custodial and medical

staff members, asserting claims under 42 U.S.C. § 1983[1] in connection with Princola's

tragic death by suicide on September 21, 2015, at the age of nineteen, while incarcerated

in the Indiana Women's Prison ("IWP"). Now before the Court are the Motions for

Summary Judgment filed by Defendants IDOC, Sonya Johnson, Jessica Jonas, Danielle

Katterhenry, Bruce Lemmon,[2] Deja Lewis, Keith Ray, Bonnie Russell, Renee Todd,

---

[1] Plaintiffs' state law claims—including their medical malpractice, wrongful death, and negligence claims—were all dismissed without prejudice on August 31, 2018. *See* Dkt. 198. Also, by failing to respond to the IDOC Defendants' arguments in its responsive briefing, Plaintiff has abandoned the following claims: (1) all privileges and immunities claims; (2) Debra Shields's independent Fourteenth Amendment claim; (3) conspiracy claims; and (4) Fourth Amendment claim. The IDOC Defendants' Motion for Summary Judgment is <u>GRANTED</u> as to these claims.

[2] It is clear that Bruce Lemmon was named in this lawsuit solely in his role as Commissioner of IDOC. We note that Robert E. Carter Jr. is the current Commissioner, appointed on January 17, 2017. In any event, Plaintiff has not put forth any argument that would support liability against

David Walker, Michael Wilkerson, Nicole Wilson, and Rebecca Witter (collectively, "the

IDOC Defendants") [Dkt. 202] and Defendants Corizon, William J. Barnett, Vickie

Burdine, Jana Cuffel, Debbie Durham, Talitha Moschell German, Keisha Hamer-Harris,

Pamela Kirkwood, Julie Murphy, Daniel Prober, James Sackett, Shonda T. Simon, and

Patricia Waltman (collectively, "the Medical Defendants") [Dkt. 204], as well as the

Cross Motion for Summary Judgment filed by Plaintiffs [Dkt. 224].  For the reasons

detailed below, we GRANT IN PART and DENY IN PART the IDOC Defendants' and

the Medical Defendants' Motions and DENY Plaintiffs' Motion.[3]

## Factual Background[4]

### Princola's Mental Health History Prior to Her Incarceration at the IWP

Princola's encounters with the criminal justice system that ultimately resulted in

her incarceration at the IWP began on July 22, 2014, when she was charged in Johnson

County, Indiana, with shoplifting.  When she subsequently failed to appear for her

---

the Commissioner in his official capacity.  Accordingly, we GRANT the IDOC Defendants' Motion for Summary Judgment as to the Commissioner.

[3] On December 21, 2018, the Medical Defendants filed a Motion for Leave to File a Sur-reply in Opposition to Plaintiff's Cross-Motion for Summary Judgment [Dkt. 240] in order to address new evidence raised in Plaintiff's reply.  We GRANT this motion.  Plaintiff's Motion to Strike Medical Defendants' Proposed Surreply Brief [Dkt. 243] is therefore DENIED.

[4] We note that Plaintiff's statement of facts and briefing are replete with incomplete, incomprehensible, and, in some cases, plainly incorrect citations to the record.  A few of the many examples include: Dkt. 216 at 46 "(Pl. Des. 10, Cuffel Depo. p. ___ ¶¶ ___)"; Dkt. 220 at 44 "(Pl. Statement of Facts, p. 43 [check])"; Dkt. 220 at 44 "(Pl. Statement of Facts, p. 45 [check])"; Dkt. 220 at 44 "(Pl. Statement of Facts, p. ___)."  We remind Plaintiff that, pursuant to Local Rule 56-1(h), "[t]he court has no duty to search or consider any part of the record not specifically cited in the manner described in subdivision (e)," which, in turn, provides that a party must "support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence."  Local Rule 56-1(e).  Accordingly, where we have been unable to verify particular facts cited by Plaintiff due to incorrect or missing citations, we have disregarded those facts.

scheduled court date, a warrant was issued for her arrest. On January 8, 2015, Princola was arrested on that warrant and incarcerated in the Johnson County Jail. The next day, on January 9, 2015, Princola told a corrections officer that she was going to kill herself and asked for a doctor and for medication. She was placed on suicide watch, a fact that was noted in her records and made a part of her file. On March 9, 2015, Princola again asked to see a mental health doctor. On March 11, 2015, she was diagnosed with major depressive disorder and placed on observation status. She was placed on a close watch on March 18, 2015. It is not clear from the record when precisely she was removed from close watch supervision.

While incarcerated at the Johnson County Jail, she was involved in an altercation. As a result, she was charged with battery, resisting law enforcement, and disorderly conduct and ultimately sentenced on April 15, 2015 to a term of 365 days, with a projected release date of October 15, 2015.

Princola was transferred to the Rockville Correctional Facility ("Rockville") on April 27, 2015. A nurse conducted her intake screening, which consisted of a Suicide Potential Screening, a Psychiatric Screening, and an assessment of her current mental status. Following the intake screening, the nurse referred Princola to Rockville mental health staff and contacted a nurse practitioner, who prescribed Celexa, an antidepressant that Princola had reported taking prior to incarceration. On April 30, 2015, Ronald Benson, LMHC, conducted a Behavioral Health Intake exam of Princola. She reported that she began using drugs and alcohol at age fourteen and that as a child she was subjected to sexual, physical, and verbal abuse. Although she denied any history of

suicidal thoughts, she indicated that she had attempted to commit suicide at age fifteen or sixteen by jumping out of a window.  Mr. Benson assigned Princola a Mental Status Classification of "C" and noted that she would need to see the psychologist and a mental health professional.

**Princola's Transfer to the IWP**

On May 3, 2015, while housed at Rockville, Princola was placed on suicide watch after she carved the word "pain" on her arm.  On May 5, 2015, shortly after this incident, Defendant Patricia Waltman, M.D., a psychiatrist at Rockville, conducted a psychiatric evaluation of Princola.  Based on that examination and Princola's mental health history, which, as noted above, included physical, sexual, and verbal abuse and a prior suicide attempt, Dr. Waltman diagnosed Princola with post-traumatic stress disorder and depression.  She prescribed Princola an antidepressant, Effexor.  As a result of her self-mutilation, Princola was assigned a Mental Status Classification Code of "E," meaning that she needed to be transferred to a correctional facility that offered a higher level of mental health care than Rockville offered.  For that reason, on May 11, 2015, Princola was transferred from Rockville to the Indiana Women's Prison ("IWP").  After Princola transferred to the IWP, Dr. Waltman had no further involvement in her treatment.[5]

Because she had engaged in self-harm while at Rockville, upon her transfer to the IWP Princola was placed directly into segregation on a mental health hold.  At that time,

---

[5] There is additional information in the record regarding other mental health care Princola received while housed at Rockville, but we do not recount it here as it did not involve any defendant named in this action and is not otherwise relevant to our decision.

IDOC contracted with Defendant Corizon Health, Inc. ("Corizon") for the provision of medical services, including mental health services. On May 12, 2015, the day after Princola's transfer, Defendant Daniel Prober, a psychologist at the IWP, evaluated her. Princola had recently been released from suicide observation and was housed in the Restrictive Housing Unit ("RSHU")[6] at the IWP. During the examination, Princola did not express suicidal or homicidal ideations and was able to understand and refrain from harmful action. Dr. Prober concluded that Princola's self-injuring behavior "may have been more related to how she sought attention than it was to depression, which was what she claimed." Prober Decl. ¶ 4. Dr. Prober's treatment plan was for Princola to continue to have routine meetings with mental health staff while in restrictive housing. *Id.*

**Princola's Mental Health Treatment at the IWP from May 12, 2015 to June 16, 2015**

Princola attended two-hour group therapy sessions led by Defendant Willie Barnett, a behavioral health specialist, on May 13, 14, and 15, 2015. Barnett Aff. ¶ 3. Mr. Barnett's responsibilities at the IWP were limited to leading group therapy sessions and facilitating discussions in those groups. Mr. Barnett was not a licensed mental health professional and therefore could not diagnose offenders' mental health needs, order mental health treatment, develop treatment plans, or prescribe medication. If he had concerns about a patient based on an interaction he observed during a therapy session, he would report those concerns to the psychologist. *Id.* ¶ 2. According to Mr. Barnett, Princola's participation was "okay" and she provided feedback to other group members

---

[6] The RSHU houses offenders placed on mental health holds as well as offenders with disciplinary issues. Wilson Dep. at 77.

during the May 13 and 14 group therapy sessions.  *Id.* ¶¶ 3–4.  The group watched a movie during the May 15 session, which Princola appeared to enjoy.  *Id.* ¶ 5.

On May 18, 2015, group therapy was offered to Princola, but she refused to participate.  *Id.* ¶ 6.  She returned to group therapy on May 19, 2015, and, despite reporting being sad, she participated actively and provided good feedback to other group members.  She informed the group that her aunt had passed away and that she was concerned for her grandmother.  Although at one point during the May 19 session Princola became somewhat disruptive, she was successfully redirected without incident.  *Id.* ¶ 7.

On May 19, 2015, Dr. Prober examined Princola for a second time, performing a Post-Suicide Observation Release examination.  During that examination, Princola denied feeling urges to attempt suicide or to engage in self-harm and indicated that she was eager to be released from restrictive housing to the general population.  Because she was not actively suicidal or self-injurious, Dr. Prober changed her Mental Status Classification Code from "E" to "C," which reflected a downgrade of her psychiatric impairment from "significant functional impairment" to "some functional impairment."  Prober Decl. ¶ 5.  According to Dr. Prober, this change in classification did not affect the mental health treatment she received, but merely indicated to the Classification Department at which prisons she could be housed based on her mental health needs.[7]  *Id.*

---

[7] Health Care Services Directive ("HCSD") 4.15 provides as follows: "This HCSD describes the process through which adult offenders are assigned an appropriate mental health status classification, which facilitates safe placement at IDOC facilities.  Dkt. 219-3, Bates No. 001194.

On May 21, 2015, Dr. Prober confirmed with Princola's caseworker that he had changed her classification code to "C" so that she was no longer a Special Needs Release. *Id.* ¶ 6.

At the time period relevant to this litigation, Defendant Janet O'Neal was the Supervisor of Classification at the IWP. Ms. O'Neal had no role in Princola's housing placement at IWP or the decision not to place Princola in a mental health unit at IWP nor was she otherwise involved with Princola's care. O'Neal Decl. ¶¶ 6–7.

Princola attended another group therapy session with Mr. Barnett on May 20, 2015. She was present only for a short period of time before she was removed and sent to a different unit in the prison. She participated without incident during the short time she was present. Barnett Aff. ¶ 8.

Dr. Prober saw Princola for another Post-Suicide Observation Release evaluation on May 28, 2015. She indicated her desire to move off the Mental Health Treatment Housing Unit as soon as possible. Princola did not express suicidal or homicidal ideation during the examination. She stated that she had been "going through something" but had not been suicidal when she carved the word "pain" into her arm and that she did not believe she would engage in any further self-harm since she had been prescribed and had begun taking an anti-depressant. Prober Decl. ¶ 7.

On May 29, 2015, Princola participated in another group therapy session with Mr. Barnett. She discussed the passing of her aunt and her concerns about her mother, who was in the hospital. Although she provided some feedback to other group members, Princola had to be redirected because of disruptive behavior during the session. Barnett Aff. ¶ 9. Princola attended additional group therapy sessions on June 1 and June 3, 2015,

for a total of four hours. She had to be redirected several times during those sessions for cross-talking. *Id.* ¶ 10.

On June 2, 2015, Defendant Debbie Durham, LPN was scheduled to see Princola for a Nursing Sick Call in response to a request for health care that Princola had submitted regarding her esophagus. Durham Aff. ¶¶ 1, 3. As a licensed practical nurse, Nurse Durham's duties as the IWP included triaging and assessing patients, taking vital signs, communicating the patient's condition to the medical provider, and following the provider's treatment orders or plan for the patient. *Id.* ¶ 2. Nurse Durham did not see Princola that day as scheduled, however, because Princola refused to follow through with her appointment. *Id.* ¶ 3.

**Princola's First Suicide Attempt at the IWP**

Princola was placed in the RSHU on June 17, 2015, after receiving a disorderly charge following a conflict with another offender. *Id.* ¶ 4. When she arrived in the RSHU, Princola took her bedsheet and tied it around her neck. A "Signal 3000" (an emergency medical call within the IWP) was called and the Quick Response Team arrived and removed the sheet from Princola's neck.

When Nurse Durham arrived in response to the call, the bedsheet had already been removed by custody staff. Princola was crying, and when Nurse Durham tried to take her vital signs and get other medical information from her, she told Durham to go away and leave her alone. She repeated several times that she wanted to die and that she would kill herself. Nurse Durham notified mental health staff and the medication nurse of Princola's placement in segregation. Durham Aff. ¶ 4. She also informed Dr. Prober of

the incident, who ordered that Princola be placed on close observation status.[8]  Prober

Decl. ¶ 8.  When Dr. Prober met with Princola later that evening, she expressed suicidal

ideation in her thoughts and intentions and was unable to understand or agree to refrain

from harmful action.  Given this information, Dr. Prober's treatment plan was to keep

Princola on suicide watch.  *Id.*  Princola was monitored by nursing staff for the remainder

of the evening but refused to have her vitals taken.  Dkt. 206-1 at 101–03.

**Princola's Treatment While on Suicide Watch from June 18, 2015 to June 22, 2015**

Dr. Prober met with Princola again on June 18, 2015, while she was on suicide

watch.  Princola initially refused to meet with Dr. Prober, but when she was advised that

her mattress would be removed from her room, apparently as part of the IWP's protocol

for those on suicide watch, she changed her mind and agreed to talk with him.  *Id.* ¶ 9.

Princola discussed with Dr. Prober the incident that had led to her receiving a disorderly

conduct charge and he expressed disappointment with her attitude and her one-word

answers to his questions about the incident.  Dr. Prober informed Princola that because of

her lack of participation in their discussion, her blanket and mattress would be removed

from her cell until 8:00 p.m.  *Id.*  Dr. Prober was concerned about further suicidal

behavior, given Princola's lack of engagement, and advised her that he would return in

the evening to talk with her.  Princola then became angry and disputed Dr. Prober's

statements.  Because Princola expressed suicide ideation and her inability to understand

---

[8] Mental health staff members at the IWP are responsible for determining whether an inmate is put on suicide watch and what level of observation they are assigned.  Custody staff members are not involved with those decisions and are merely told of an inmate's classification once assigned. Wilson Dep. at 73.

or agree to refrain from harmful action, Dr. Prober concluded that she should remain on suicide monitoring. *Id.* ¶ 9.

Nurse Durham evaluated Princola later that same day. Princola denied thoughts of hurting herself but expressed frustration that her mattress had been taken from her and would not be returned until 8:00 p.m. that evening. Nurse Durham noted that Princola's mood was depressed and that she was crying, but that she did not express suicidal ideation and was able to understand and agree to refrain from harmful action. Durham Aff. ¶ 5. Another nurse evaluated Princola later that evening and she was kept on suicide observation by behavioral health staff. *Id.*; Dkt. 206-1 at 111–14.

The next day, on June 19, 2015, Dr. Prober again met with Princola for a Suicide Observation assessment. Princola did not express suicidal ideation and was able to understand and agree to refrain from harmful action. She indicated that she wanted to be released from suicide precautions, but Dr. Prober explained that that would not occur that day (which was a Friday) because, among other reasons, it was his general practice not to release offenders from suicide precautions on Fridays due to mental health staff not being present in the facility on weekends. Accordingly, Dr. Prober advised that Princola's suicide observation level would be continued throughout the weekend. *Id.* ¶ 10. Princola accused Dr. Prober of acting punitively by failing to release her from suicide precautions that day. *Id.*

That same day, on June 19, 2015, Defendant Vickie Burdine, M.D. conducted a mental health examination of Princola for medication management purposes. Burdine Aff. ¶ 3. Dr. Burdine was the psychiatrist at the IWP and her primary role was to

prescribe and manage offenders' psychiatric medications. She was not responsible for

monitoring the day-to-day mental health needs and functioning of patients, duties which

were performed by other mental health staff members, including the psychologist,

licensed clinical social workers, and others with varying degrees and levels of experience.

*Id.* ¶ 2. At the time of her exam, Dr. Burdine took note of Princola's mental health

history, including her suicide attempt earlier that week. Princola denied feeling suicidal

but still exhibited some symptoms of anxiety and depression and was easily

overwhelmed. Dr. Burdine noted that Princola had a history of non-suicidal self-injury

and that she had recently cut herself, although the cuts were superficial. *Id.* Following

the examination, Dr. Burdine prescribed Remeron, an antidepressant, continued her

Effexor prescription, and scheduled Princola to return to the clinic in two weeks. *Id.*

Nurse Durham monitored Princola on June 19, 2015, while she was on suicide

watch. When examined, Princola denied suicidal thoughts and was pleasant and

cooperative. Durham Aff. ¶ 6. She was continued on suicide observation. *Id.*

The next day, June 20, 2015, while still on suicide watch, Princola was monitored

by Defendant Talitha Moschell-German, RN. As a Registered Nurse, Moschell-

German's duties at the IWP included triaging and assessing patients, taking vital signs,

communicating the patient's condition to the medical provider, and following the

provider's treatment orders or plan for the patient. Nurse Moschell-German completed

the mental health checklist regarding Princola's appearance and behavior. Princola did

not express suicidal ideation, was able to understand and agree to refrain from harmful

action and raised no complaints. Following her assessment, Nurse Moschell-German

contacted Dr. Prober and received verbal orders to continue Princola's suicide observation at the same level. Moschell-German Aff. ¶¶ 2–3. Nurse Moschell-German assessed Princola again on June 21, 2015. Princola again denied suicidal thoughts, was able to understand and agree to refrain from harmful action, and expressed no complaints. Dr. Prober again gave verbal orders to Nurse Moschell-German to continue Princola's suicide observation at the same level. *Id.* ¶ 4.

Defendant Keisha Hamer-Harris, LPN monitored Princola on June 21 and June 22, 2015, while she was on suicide watch. Nurse Hamer-Harris performed a mental status checklist at each assessment and all findings were normal. On both days, Princola denied wanting to harm herself or others and reported no physical health issues that needed to be addressed. Hamer-Harris Aff. ¶¶ 3–4. After June 22, 2015, Nurse Hamer-Harris had no further involvement with Princola's treatment. *Id.* ¶ 5.

Dr. Prober performed another suicide monitoring assessment of Princola on June 22, 2015. During the assessment, Princola reported that she was not suicidal and acknowledged that she understood that she had time to serve in the RSHU due to her disciplinary violations. Prober Aff. ¶ 11. At all relevant times, it was IWP policy that custody staff monitor at fifteen-minute intervals offenders who are on suicide precautions and document their observations. Part of Dr. Prober's June 22 assessment included a review of the documentation produced by custody staff of their observations of Princola while on suicide watch. After reviewing that documentation and speaking with Princola, Dr. Prober advised her that, although he was discontinuing her suicide observation, he would continue to prohibit her from possessing a bra or regular bedding because he was

concerned that she might at some point use such materials to engage in self-harming behavior. *Id.* Princola was upset by these restrictions, arguing that there were other offenders who had all of their property and personal garments returned to them once they were released from suicide precautions. She complained that she was being mistreated and indicated that she would refuse to attend group therapy if she had limits on her undergarments. She stated that Dr. Prober's undergarment restrictions were "mean" and insensitive to her feelings as a survivor of sexual assault. *Id.* Dr. Prober advised her that he would be mindful of her wishes to have her property returned and to have all restrictions lifted, but that the previously identified restrictions would remain until further notice. *Id.*

**Princola's Mental Health Treatment from June 23, 2015 to August 10, 2015**

Dr. Prober met with Princola on June 23, 2015 for another Post-Suicide Observation Release assessment. Princola reported that her mood was good and that she had been attending group therapy. However, she indicated that she was upset that Dr. Prober continued prohibiting her from possessing a bra and certain other personal items. She did not express suicidal ideation and was able to understand and agree to refrain from harmful action. Prober Aff. ¶ 12.

Princola attended several group therapy sessions between June 25, 2015 and June 30, 2015. Her behavior was satisfactory during the June 25 session and she reported that she had learned to be responsible for her own actions. At the June 26 session, the group watched a movie. Princola had to be redirected at the June 29 session because of her immature behavior. She also attended group therapy on June 30, and, although she

13

participated and gave feedback to the group, she asked to leave after the first hour of the two-hour session.  Barnett Aff. ¶¶ 13–15.

On June 30, 2015, Princola again met with Dr. Prober for a Post-Suicide Observation Release assessment.  Princola did not express suicidal ideation and was able to understand and agree to refrain from harmful action.  She reported that she had engaged in a temper tantrum over the weekend and had left her Serious Mental Illness group after only one hour.  Princola then reiterated her previous request that she be permitted to have a bra and regular bedding, stating that she had other property in her possession that she could use to self-injure.  Dr. Prober advised her that there was a concern about her continuing mood problems, citing the fact that she had previously engaged in a suicidal gesture by wrapping a bedsheet around her neck.  Princola rejoined that that incident had occurred some time prior and that he could not withhold her property indefinitely.  Dr. Prober told her that he believed she could be improving her quality of life but that she was using her incarceration and status in the RSHU as an excuse not to do so.  Princola then told Dr. Prober that she did not like him and did not look forward to meeting with him.  At that point, Dr. Prober advised her that she was by her attitude being destructive to her therapy.  Prober Aff. ¶ 13.

Princola attended group therapy with Mr. Barnett on July 1 and 2, 2015.  Her attitude and behavior throughout both sessions were appropriate.  Princola also participated in group therapy on July 7, 2015.  She then refused to attend group therapy on July 8, 2015 but returned on July 9, 2015 and behaved appropriately.  Barnet Aff. ¶¶ 16–20.

Dr. Prober met with Princola on July 9, 2015 for a Post-Suicide Observation Release assessment. Princola reported that she was functioning well and apologized for her behavior at their last meeting. She asked reasonable questions about her medication and the manner in which her medication would be handled at the time of her release. She denied suicidal thoughts and was able to understand and agree to refrain from harmful action. Prober Aff. ¶ 14.

Princola attended group therapy with Mr. Barnett on July 10, 2015 and behaved appropriately. Barnett Aff. ¶ 21. She also participated in group therapy on July 13 and 14, 2015. Princola informed Mr. Barnett that she would like her name removed from the group list because she would not be back to group therapy. Mr. Barnett told her that he would keep her name on the group list but that she could refuse group therapy if she preferred. *Id.* ¶¶ 22–23.

On July 21, 2015, the medical staff was alerted that Princola had been placed in the RSHU. Nurse Durham attempted to examine Princola for an Initial Segregation Review, but she (Princola) refused to have her vital signs measured or to answer any questions other than to deny having any suicidal thoughts. Nurse Durham was unable to complete a full suicide screen, however, because Princola would not answer any questions and kept telling Durham to leave her alone. Nurse Durham noted that Princola had no physical health issues which precluded her placement in segregation and notified behavioral health staff of her placement. Durham Aff. ¶ 7.

The next day, on July 22, 2015, Dr. Prober placed Princola on a mental health hold prior to her placement back in restrictive housing. He also conducted a Post-Suicide

Observation Release follow-up at that time. Princola reported that she had been placed in the RSHU for fighting but claimed that she had not actually been fighting. She denied suicidal thoughts and denied having any psychotic symptoms. She was able to understand and agree to refrain from harmful action. Dr. Prober noted that Princola did not meet serious mental illness criteria at that time and concluded that she could be placed in restrictive housing with routine monitoring by mental health staff. Prober Aff. ¶ 15.

On July 23, 2015, IWP Correctional Sgt. Rebecca Witter received information that Princola had made statements indicating that she wanted to hurt herself. Pursuant to IDOC policy and her training, Sgt. Witter notified Leslie Weaver, MHP about those statements and Ms. Weaver met with Princola later that same day. Witter Decl. ¶ 5. Princola provided Ms. Weaver information regarding her adolescence, her incarceration, and the status of her conduct reports. Ms. Weaver noted that Princola presented this information "in a way that blame[d] others and denie[d] the need for [Princola] to take personal responsibility for [her] actions." Dkt. 206-1 at 185. Princola also reported that she had had photographs confiscated from a letter she had received earlier that day and was very upset that she would be given a conduct report for that, when she did not request that the pictures be sent to her. *Id.* By the end of the session, Princola stated that she felt better after speaking with Ms. Weaver and that she was mostly just upset when she reported to custody staff thoughts of self-harm. She denied having suicidal thoughts at that time. *Id.*

The next day, on July 24, 2015, Princola attended a group therapy session with Mr. Barnett. The group watched a movie that Princola appeared to enjoy. Barnett Aff. ¶ 24. Approximately one week later, on July 31, 2015, Dr. Burdine refilled Princola's prescriptions for Effexor and Remeron until she could be scheduled for an appointment. Burdine Aff. ¶ 4.; Dkt. 206-1 at 190–91.

On August 5, 2015, Princola was again placed in the RSHU. Defendant Shonda Simon, LPN was the nurse on the restrictive housing unit that day and was notified of Princola's placement. Nurse Simon completed the Initial Segregation Review and noted that Princola was taking "psyche meds" and had made suicide attempts "in [M]ay 2015 and [J]une 2015 (wrapped sheet around neck)." Dkt. 206-1 at 192. However, Princola did not report any issues that day that precluded her from being housed in segregation. *Id.* Dr. Prober attempted to meet with Princola on August 6, 2015, but she refused. Prober Aff. ¶ 16.

Dr. Burdine evaluated Princola on August 7, 2015 to assess how the medications she had been prescribed were working. Princola asked for medications for depression and raised a concern regarding problems with sleep. Dr. Burdine noted that Princola was compliant with her medication schedule, was showing moderate improvement, and had denied experiencing any significant side effects or other issues. Dr. Burdine decided to continue Princola on the same medications (Remeron and Effexor) at the same doses she had previously been prescribed and made orders for Princola to return to the clinic in two months. Burdine Aff. ¶ 5.

Later that day, on August 7, 2015, Princola had a Behavioral Health Segregation Visit with Dr. Prober. Princola reported that she was returning to the RSHU because she had been involved in a fight. She denied suicidal ideation and was able to understand and agree to refrain from harmful action. According to Dr. Prober, he believed that Princola's presenting concerns appeared to be behavioral in nature as opposed to being related to any psychiatric illness. She had been released from suicide precautions more than thirty days earlier and Dr. Prober concluded that at that point there was no reason to place her in Serious Mental Illness groups. Prober Aff. ¶ 17.

**Princola's Second Suicide Attempt at the IWP**

Four days later, on August 11, 2015, while in segregation, Princola again wrapped a bedsheet around her neck and attempted suicide by tying the sheet to the support piece of her "desk/seat combo" in her cell and pulling the sheet tight against her neck with downward force. Dkt. 206-1 at 203. Thomas Davis, RN responded to examine Princola and a knife was used to cut the bedsheet from her neck. Her neck was reddened but unchaffed. The incident lasted less than four minutes and Princola never lost consciousness. She refused to talk after being cut loose. *Id.* Princola was placed on suicide observation following this attempt and Dr. Prober met with her later in the day for an initial suicide observation visit. Prober Aff. ¶ 18. She expressed suicidal ideation and was unable to understand or agree to refrain from harmful action. Dr. Prober continued Princola on suicide observation and increased her monitoring to "close observation." *Id.*

**Princola's Treatment While on Suicide Watch from August 12, 2015 to August 13, 2015**

Princola continued to be monitored on close observation by the nursing staff on August 12, 2015. She was awakened from sleep for her suicide assessment and refused to have her vital signs taken, stating, "Leave me alone. I want to go back to sleep." Dkt. 206-1 at 212. She did answer all of the nurse's questions, however, and denied wanting to hurt herself. *Id.* Dr. Prober met with Princola later that day. She did not express suicidal ideation and was able to understand and agree to refrain from harmful action. Prober Aff. ¶ 19. Dr. Prober allowed her to have a toilet, a soft covered book, eyeglasses, a drinking cup, a suicide gown, a suicide blanket, one additional blanket, and only finger foods. *Id.* He ordered that close observation of Princola be continued. *Id.* Nurse Simon evaluated Princola that evening and described her behavior as "agitated," her speech "delayed," her affect "flat," and her mood "irritable." Dkt. 206-1 at 219. Princola refused to let Nurse Simon take her vital signs but denied any threats of self-harm. Simon Aff. ¶ 4. Nurse Simon noted in Princola's medical records that the plan was to continue close observation. *Id.*

Nurse Simon evaluated Princola again the next day, on August 13, 2015. Princola once again refused to allow Nurse Simon to take her vital signs. Nurse Simon noted that Princola's mood was "depressed" and her affect was "flat," but that she did not express suicidal ideation and was able to understand and agree to refrain from harmful action. *Id.* ¶ 5. Later that day, Dr. Prober met with Princola for a suicide observation visit. She did not express suicidal ideation, denied suicidal urges, and was able to understand and refrain from harmful action. Dr. Prober reviewed the reports from custody staff of their observations of Princola while on suicide precautions and then determined that she could

be released from close observation.  Dr. Prober permitted Princola to have hygiene supplies, toilet paper, pencils, pens, a regular restrictive housing uniform, regular bedding, underwear (but still no bra), a drinking cup, and regular meals.  Prober Aff. ¶ 20.

**Princola's Mental Health Treatment from August 14, 2015 to September 20, 2015**

On August 14, 2015, Dr. Prober met with Princola for a One Day Post-Suicide Watch assessment.  Princola told Dr. Prober that she was not depressed and therefore wanted to meet with the psychiatrist to have her Effexor gradually discontinued because she experienced withdrawal when she tried to discontinue it herself.  Dr. Prober advised her to continue taking her medications as prescribed, citing the fact that, throughout her incarceration, she had experienced a number of episodes of dysphoric mood that had led to self-injuring behaviors.  Dr. Prober observed that Princola appeared to find this discussion upsetting.  She also stated that she wanted to start group therapy that day (a Friday), but Dr. Prober advised her that she would start on Monday, August 17, 2015.  Princola did not express suicidal ideation, denied having thoughts of wanting to hurt herself, and was able to understand and agree to refrain from harmful action.  Prober Aff. ¶ 21.

Princola attended group therapy with Mr. Barnett each day from August 17, 2015 to August 19, 2015.  Her behavior during each session was appropriate, although she left the August 18 session after the first hour of the two-hour session.  Barnett Aff. ¶¶ 25–27.

Dr. Prober met with Princola on August 19, 2015 for a Post-Suicide Observation Release meeting.  At the meeting, Princola stated that she had been told that she would be

in the RSHU for the remainder of her sentence, which was set to end in early October. She had previously authored a note requesting to be housed in Unit 10, rather than the RSHU, but she did not discuss that note during her meeting with Dr. Prober. Princola told Dr. Prober that she was reading several books and was working on writing her own book, titled, "The Worst Vacay Ever." Prober Aff. ¶ 22. Her demeanor and behavior during the meeting were otherwise unremarkable. She did not express suicidal ideation and was able to understand and agree to refrain from harmful action. Dr. Prober permitted her to have her bra and other undergarments. *Id.* Dr. Prober did not evaluate Princola again after the August 19 assessment. *Id.* ¶ 23.

Princola attended group therapy led by Mr. Barnett on August 20 and 21, 2015. On August 20, she participated in the group session but then became disrespectful and had to be removed from the group. Barnett Aff. ¶ 28. She returned to group the next day and enjoyed the movie they watched. *Id.* ¶ 29.

On August 24, 2015, Princola had a Post-Suicide Observation Release monitoring meeting with Terry Smith, LMHC, two weeks after she had been released from close observation. Princola denied being depressed and stated that she was not presently angry with anyone. Dkt. 206-1 at 245. She was focused on her discharge, which was to be in fifty-three days. She reported that she was working on finding a shelter where she could live when she was released. *Id.* Princola did not express suicidal ideation and was able to understand and agree to refrain from harmful action. *Id.* at 246.

Princola attended group therapy with Mr. Barnett on several occasions from August 24, 2015 through September 3, 2015. She participated in the August 24 session,

but had to be redirected due to bad language. At the August 25 session, she left early when she became upset over a comment. She participated well in the group sessions held on August 26 and 27. The group watched a movie at the August 28 session, which Princola appeared to enjoy. She participated well in the August 31 session as well. She attended another group therapy session on September 1 but became upset and left early. At the September 2 session, Princola discussed her desire to live with her grandmother after her release but indicated that she would not be able to do so. She also discussed feeling that her family did not love her. The group watched another movie at the September 3 session and Princola behaved appropriately. Barnett Aff. ¶¶ 30–38.

On September 3, 2015, Nurse Durham saw Princola for triage based on three healthcare requests she had submitted the day before regarding a possible urinary tract infection, a facial rash, and acne, respectively. Durham Aff. ¶¶ 8–9. Nurse Dunham took her vital signs and a health history, reviewed her symptoms, and referred her to the doctor. *Id.*

Princola participated in a behavioral health segregation visit with LMHC Smith on September 4, 2015. During the visit, she was able to understand and agree to refrain from harmful action. She reported that she had forty-one days until her discharge date and expressed concern about where she would go once discharged because she was homeless and had no contact with her family. Princola stated that Child Protective Services had removed her from her family at a very young age, that she later ran away, and had resided in a series of foster care groups, group homes, and locked facilities prior to her incarceration. Although Princola had not yet completed her GED, she spoke about

her hopes of attending college and becoming a nurse. Medical notes from that visit state that Princola "is childlike in her thinking, not reality connected and has little insight." Dkt. 206-1 at 268.

On September 8, 2015, in response to several healthcare requests she had made, Princola was seen by Dr. James Sackett. She indicated that she had been spit upon and wanted to be tested for Herpes 1 and 2. She also thought she had a urinary tract infection ("UTI") and was suffering from mild acne. Princola's physical examination was normal. Dr. Sackett explained that it would be too early for a herpes test to detect any antibodies from the recent spitting incident, but still ordered a test to determine if she was positive for herpes that day. He ordered a urinalysis to check for a UTI, which was negative. He also ordered a topical ointment to treat Princola's acne. Sackett Aff. ¶¶ 1–3. That same day, Nurse Durham documented that Princola had seen the doctor and that her blood had been drawn. Durham Aff. ¶ 10.

Princola attended a group therapy session with Mr. Barnett on September 9, 2015. Her behavior was appropriate, and she talked about moving in with her grandmother after her release. Barnett Aff. ¶ 39. The next day, on September 10, 2015, Princola had another behavioral health segregation visit with LMHC Smith. Princola appeared relaxed, was conversant, and appropriately groomed. She expressed excitement about her grandmother's offer of a place to stay upon her release and stated that she would return to her prior job at a hamburger establishment. Dkt. 206-1 at 275–76. Later that day, Princola attended another group therapy session with Mr. Barnett at which she led the group discussion and behaved appropriately. Barnett Aff. ¶ 40. That evening, Nurse

Simon examined Princola for swollen eyes and a red, itchy face. Nurse Simon took Princola's vital signs, obtained a health history, reviewed her symptoms, performed a physical assessment, and received orders from Dr. Sackett to prescribe Prednisone. Simon Aff. ¶ 6; Dkt. 206-1 at 279–81.

Princola attended group therapy sessions led by Mr. Barnett on September 11 and 14, 2015. Her behavior was appropriate throughout the September 11 session. At the September 14 session, before having to be dismissed from the session for disruptive behavior, she shared with the group that she would be living in a group home after her release. Barnett Aff. ¶¶ 41–42.

On September 17, 2015, Nurse Moschell-German examined Princola after she submitted a healthcare request regarding neck pain. Nurse Moschell-German took Princola's vital signs and health history, reviewed her symptoms, performed a physical examination, and advised her on using heat, ice, and pain relievers from the Commissary to treat her neck. Moschell-German Aff. ¶ 5. Princola was seen by Nurse Simon on September 20, 2015, based on complaints regarding her stool and constipation. Nurse Simon took Princola's vital signs and health history, listened to her complaints, and advised her to drink plenty of fluids and to purchase fiber from the Commissary until she could be seen by a doctor. Nurse Simon noted that Princola was in a good and happy mood that day and that they laughed about something together. Simon Aff. ¶¶ 7–9.

**Princola's Placement in RSHU on September 21, 2015**

On September 21, 2015, Princola received a disorderly conduct report while in the dining hall based on an interaction she had with IWP Superintendent Stephen McCauley.

As a result of receiving the disorderly conduct report, she was escorted to the RSHU by custody staff, including IWP Correctional Sgt. Bonnie Russell. McCauley Decl. ¶ 7; Russell Decl. ¶ 4.

At approximately 12:00 p.m., Sgt. Todd came to meet Sgt. Russell at the door of Building 8 where the RSHU was located to help escort Princola to the RSHU, also known as Unit 11. Todd Dep. at 69. Once Sgt. Todd took custody of Princola, Sgt. Russell was no longer assigned to monitor Princola and Russell had no further contact with her. Russell Decl. ¶ 4. Sgt. Todd took Princola to a shower stall in the RSHU which was where offenders being transferred to restrictive housing were first held. The shower stall holding cell in which Princola was placed had a bed sheet that was used for a shower curtain. Sgt. Todd testified that it was policy to place offenders in the shower stall until the corrections staff contacted medical staff to perform a mental health assessment of the offender. Todd Dep. at 84–85. Once the assessment was completed, it was policy for the female officer on duty in the RSHU to strip search the offender. *Id.* Sgt. Todd further testified that it was policy for offenders in the holding cell to be on 15-minute visuals.[9] *Id.* at 85. There is no dispute that, on September 21, 2015, no one from the corrections staff contacted medical to alert the staff that Princola was in the RSHU and she therefore did not receive a mental health assessment. She was also not strip searched, nor was she on 15-minute visuals.

---

[9] There is some dispute whether the 15-minute visual observation requirement was for only those offenders who were on suicide watch and being held in the RSHU.

Upon arrival to the RSHU, Sgt. Todd spoke with Princola in the shower stall where she was being held and noted that Princola was "really upset." Todd Dep. at 42. According to Sgt. Todd, Princola "was begging" Todd to release her from the RSHU and "kept asking" Todd not to leave her and to stay with her. *Id.* 42, 87. Princola also expressed concern that her placement in restricted housing would affect her release date, and that her grandmother would be angry with her and decide that she could no longer live with her upon release. *Id.* at 42. Sgt. Todd told Princola that she would do what she could to help and stayed with Princola for a few minutes until she seemed calm. *Id.* at 87. Sgt. Todd then left the RSHU to respond to a call she had received on her radio requesting assistance in another unit of the prison. *Id.* at 50. Princola never stated that she felt suicidal or that she wanted to hurt herself during this exchange with Sgt. Todd. *Id.* at 121.

IWP Correctional Officer Michael Wilkerson observed Princola briefly on September 21, 2015 while she was in the holding area of RSHU but did not hear her make any statements or engage in any behavior that concerned him. He had no further contact with Princola that day. Wilkerson Decl. ¶¶ 7–9. Defendant Captain Nicole Wilson also observed Princola twice in the holding area of RSHU while Wilson was making rounds on September 21, 2015. According to Captain Wilson, Princola was "screaming loudly" when Wilson was making her rounds but was not making any threats to hurt herself. Wilson Dep. at 114.

Cynthia Stilwell, an IDOC employee responsible for performing investigations at the IWP, also reported hearing Princola "yelling frantically from a shower cell" on

September 21, 2015. Stilwell Dep. at 14. Ms. Stilwell could not make out the words Princola was yelling because "[i]t was kind of like someone screaming at the top of their lungs, and you can't understand what they are saying." *Id.* at 15. When Ms. Stilwell entered the cell, Princola said that she wanted to speak to a captain. Ms. Stilwell conveyed this message to custody staff and they said they were aware of it. She then went back to her office. The record is not clear what time this occurred.

**Princola's Suicide**

At approximately 3:14 p.m. on September 21, 2015, IWP Correctional Officer Sonya Johnson entered the bathroom area of the RSHU where Princola was being held in a shower stall and observed Princola in a standing position with her knees buckled and a bedsheet tied around her neck. Johnson Decl. ¶ 7. Officer Johnson immediately walked out of the bathroom and called out to Sgt. Todd, who by that time had returned to the RSHU, and advised Todd to call a Signal 3000. *Id.* Officer Johnson then proceeded to the doors of the RSHU to allow medical staff to enter the unit when they responded. *Id.* ¶ 9.

At some point between 3:15 and 3:17 p.m., Sgt. Todd called the Signal 3000 and then entered the shower stall in the bathroom to determine what had prompted Officer Johnson to instruct her to make the call. Todd Dep. at 52. Upon entering the shower stall, Sgt. Todd observed Princola hanging from a bedsheet that had been twisted and knotted. *Id.* at 53. Princola had had access to the bedsheet because it was used as a shower curtain in the shower stall where she was being held.

Defendants IWP Correctional Officers Jessica Jonas, Danielle Katterhenry, Keith Ray, and Deja Lewis were all first responders to the Signal 3000. Upon their arrival in the RSHU, Sgt. Todd instructed Officer Jonas to retrieve the cutdown tool, which she did. Sgt. Todd then attempted to use the tool in a shredding motion to cut through the bedsheet around Princola's neck. *Id.* at 78; Jonas Decl. ¶10. When Sgt. Todd realized that this approach was not effective and was taking too much time, she instructed other responders, including Officers Jonas, Katterhenry and Ray, to lift and hold Princola's body in order to relieve pressure around her neck so that Todd could untie the knots and remove the bedsheet. Todd Dep. at 78; Jonas Decl. ¶ 10; Katterhenry Decl. ¶ 7; Ray Decl. ¶ 7. Around this same time, Defendant Pamela Kirkwood, LPN was coming from the infirmary when she became aware of the medical emergency and immediately responded to the scene. When she arrived, she assisted custody staff in holding and lifting Princola's body. Kirkwood Aff. ¶ 3.

Once the bedsheet had been removed from Princola's neck, she was lowered to the ground by the first responders. Her pupils were red, fixed, and not responsive to light. She was not breathing and had no pulse, at which point Nurse Kirkwood and Sgt. Todd began CPR. Kirkwood Aff. ¶ 3. Defendant IWP Correctional Officer David Walker arrived at the RSHU in response to the Signal 3000 when custody staff was lowering Princola to the floor. He observed Sgt. Todd begin CPR but did not have any other involvement in the rescue efforts. Walker Decl. ¶¶ 6–7.

While performing CPR, Nurse Kirkwood yelled several times to the custody officer at the desk to have someone to call 911. *Id.* Officer Jonas left the holding area of

the RSHU to retrieve the defibrillator and gave it to Nurse Kirkwood, after which Jonas went to the back doors of the RSHU to wait for medical staff. Katterhenry Decl. ¶ 7–8. Nurse Kirkwood applied the defibrillator and shocked Princola twice, but there was no response. When medical staff arrived at the RSHU, Officer Lewis left the holding area so medical staff could treat Princola. Lewis Decl. ¶ 8.

In response to Nurse Kirkwood's directions to call 911, Captain Wilson telephoned Defendant Julie Murphy, the Health Services Administrator for Corizon, and informed Murphy that Nurse Kirkwood wanted 911 called. Murphy Aff. ¶ 3. Captain Wilson did not relay to Ms. Murphy any information regarding the reason emergency services were needed or otherwise provide her any details regarding the nature of the emergency or Princola's condition. *Id.* There is a dispute regarding what was said next. According to Captain Wilson, Ms. Murphy responded, "okay," and hung up the telephone, leading Wilson to believe that Murphy was making the call. Ms. Murphy, however, avers that, without information regarding the nature of the emergency, she would not have known what to tell the 911 operator, and so she instructed Captain Wilson to call for emergency services by responding, "Okay. Call them." Murphy Aff. ¶ 3. In any event, it is undisputed that neither Captain Wilson nor Ms. Murphy contacted emergency services following this exchange, each apparently believing the other was doing so.

After the call with Captain Wilson ended, Ms. Murphy called Building 8 and was told that the incident in question had occurred in Unit 11 (the RSHU). Ms. Murphy then called Unit 11 and was told that Nurse Kirkwood was performing CPR on Princola after

she had hanged herself. *Id.* ¶ 4. Ms. Murphy disconnected the call and went to the RSHU to assist, enlisting Dr. Sackett and Defendant Jana Cuffel to accompany her. *Id.* ¶ 5.

When Ms. Murphy arrived on the scene, Nurse Kirkwood and Sgt. Todd were continuing to perform CPR on Princola. Ms. Murphy, who is a nurse, attempted to start an IV so that it would be ready when the EMTs arrived, but was unable to establish one. *Id.* ¶ 6. Dr. Sackett made a second attempt to insert an IV but was also unsuccessful. *Id.* Following these unsuccessful attempts, Ms. Murphy and Dr. Sackett began assisting Nurse Kirkwood and Sgt. Todd with CPR. *Id.* Although not entirely clear from the record, Ms. Murphy, Dr. Sackett, and Nurse Cuffel arrived at the scene somewhere between 3:27 p.m. and 3:31 p.m.

Nurse Cuffel went to the Building 8 nursing station to procure an oxygen tank. Upon her return to the RSHU, she started Princola on oxygen via a non-rebreather mask. She quickly determined that the oxygen tank's reserves were low and would not last long, so she ran back up to the main infirmary to collect a full tank of oxygen before returning to the RSHU. Upon her return, she was surprised to find that the ambulance had not yet arrived on the scene. When she asked custody staff members why the paramedics had not responded, she realized that no one had contacted emergency services. Nurse Cuffel immediately grabbed Ms. Murphy's cell phone from Murphy's waist and called 911 herself. Cuffel Aff. ¶¶ 2–7. Nurse Cuffel never personally performed CPR on Princola because Princola was already being attended to by other medical staff who continued CPR until EMS arrived between 3:49 p.m. and 3:51 p.m. *Id.* ¶ 5; Murphy Aff. ¶ 8;

Sackett Aff. ¶ 6; Kirkwood Aff. ¶ 2.  Princola's care was then turned over to EMS who continued to perform CPR.

**The Autopsy Report and Expert Testimony**

Princola was taken by ambulance to Eskenazi Hospital where she was placed in the Intensive Care Unit with a poor prognosis and subsequently died at 1:53 a.m. on September 22, 2015.  The autopsy report lists Princola's cause of death as "Asphyxia due to Hanging."  Dkt. 229-7 at 1.  The report also notes, *inter alia*, that there were two lacerations found on Princola's liver.  *Id.* at 5.  Darin L. Wolfe, M.D., the coroner who performed the autopsy testified that, upon opening Princola's abdominal cavity, a large amount of blood—in total 4,500 ccs, the usual amount of blood in the entire human body—was collected.  Dkt. 222-9 ¶ 4.  He testified that, in his opinion, while it is not unusual to find liver lacerations after CPR is conducted, the amount of blood that he found was abnormal, leading him to conclude that CPR was performed on Princola while her heart was still beating.  *Id.* ¶¶ 6–7.  According to Dr. Wolfe, chest compressions should not be performed while a patient has a heartbeat and thus a blood pressure, as it increases the risk of injury to bodily organs, including lacerations of the liver which can result in significant blood loss if the heart is beating at the time of, and after the injury. *Id.* ¶ 8.  He further opined that Princola's chance of survival was likely impacted by the presence of that amount of blood in her abdomen.  *Id.* ¶ 9.

In response to Dr. Wolfe's affidavit, Defendants procured the affidavits of two experts, Thomas Short, M.D. and Stephen S. Radentz, M.D.  Dr. Short testified that CPR is "an extremely violent and traumatic event to the body" that can commonly cause

31

physical damage, including "the liver lacerations that were found on the autopsy." Short Aff. ¶ 7. Dr. Short testified that there is no way for a person performing CPR to know if they are causing liver lacerations. *Id.* According to Dr. Short, regardless of the liver lacerations and blood in the abdomen, the cause of Princola's death was lack of oxygen that caused brain death, not any complications from CPR. *Id.* ¶ 8.

Dr. Radentz reviewed Dr. Wolfe's affidavit and opined that the autopsy report and photographs do not support Dr. Wolfe's conclusion that the abdominal bleeding originated from the liver and that the photographs of the liver "are essentially unremarkable for a post-CPR case" (Radentz Rep. at 3) and "do not demonstrate significant liver injury or any evidence that it was the cause of significant hemorrhage." *Id.* at 5. Dr. Radentz further opined that the theory that performing CPR on a patient with a beating heart would cause massive additional hemorrhaging is unfounded and the cause of the abdominal fluid accumulation "was likely due to the femoral IV line perforating the inferior vena cava and ˜18 liters of IV fluids administered over the course of the ˜9 hour hospitalization." *Id.* Finally, Dr. Radentz's report states that the accumulation of fluid did not contribute to Princola's death because "the clinical information is compelling that when [she] was first discovered she was clinically dead and had already suffered irreversible brain damage." *Id.*

**The Instant Litigation**

Plaintiffs, the Estate of Princola Shields, by Debra Shields as Personal Representative, and Debra Shields in her individual capacity filed their Complaint in this action on August 11, 2016, alleging claims under § 1983 and well as various state law

claims against the Medical and IDOC Defendants.  The only claims currently remaining in this lawsuit are the Estate's Eighth Amendment claims brought under § 1983. Accordingly, hereinafter we refer only to "Plaintiff" or "the Estate."

The IDOC Defendants and the Medical Defendants both filed motions for summary judgment on September 4, 2018.  On October 22, 2018, Plaintiff filed its motion for summary judgment.  These fully-briefed motions are now before us.

## Legal Analysis

### I.    Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

Courts often confront cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief.  "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." *Kohl v. Ass'n of Trial Lawyers of Am.*, 183 F.R.D. 475 (D.Md. 1998).  Thus, in

determining whether genuine and material factual disputes exist in this case, the Court has considered the parties' respective memoranda and the exhibits attached there to, and has construed all facts and drawn all reasonably inferences therefrom in the light most favorable to the respective non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

## II.    Discussion

In this lawsuit, Plaintiff claims that the Medical Defendants and the IDOC Defendants were deliberately indifferent to Princola's serious medical needs, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment, and that IDOC and Corizon are liable because they failed to have in place a practice or policy to ensure coordination between the corrections and mental health staff and that failure caused Princola constitutional injury. We address these claims in turn below.

### A.    Individual Defendants

The Eighth Amendment's prohibition against cruel and unusual punishment protects inmates "against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Rodriquez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). In medical care cases under the Eighth Amendment, courts "perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc).

"At the first step, the risk of suicide is an objectively serious medical condition, and it is well established that inmates have the right to be free from deliberate indifference to this risk while in custody." *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019) (citations omitted). In cases where suicide or attempted suicide is the harm at issue, "the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). This standard requires "more than mere or gross negligence, but less than purposeful infliction of harm." *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003).

Because it is undisputed that suicide is a serious medical condition, the only issue in dispute here is whether any of the individual Medical Defendants or IDOC Defendants both knew Princola was at substantial risk of committing suicide and intentionally disregarded that risk. We address the relevant facts as to each defendant in turn below.

### i. Medical Defendants

Plaintiff has brought this lawsuit against nearly every medical professional who had any contact with Princola throughout the time of her incarcerations. A number of these defendants were either not present at the IWP on the day of Princola's suicide or worked for another prison altogether. We can therefore dispense with the claims against these defendants in short order.

Patricia Walton

Defendant Patricia Walton, M.D. was the psychiatrist who treated Princola at Rockville in early May 2015, after Princola engaged in self-harming behavior while incarcerated there. As a result of Princola's self-mutilation, Dr. Walton assigned her a Mental Status Classification Code of "E," meaning that she needed to be transferred to a correctional facility that offered a higher level of mental health care than Rockville offered. After Princola was transferred to the IWP on May 11, 2015, Dr. Walton was no longer responsible for her care. Plaintiff claims that Dr. Walton is liable on grounds that she failed to ensure that IDOC's suicide prevention policies were implemented on the day of Princola's suicide. It is undisputed, however, that Dr. Walton has never worked at the IWP and had no input into or control over the care that Princola received there, much less any control over how IDOC's policies were implemented. This evidence in no way supports a finding that Dr. Walton was indifferent to Princola's serious medical needs, and, in fact, Plaintiff's claims against Dr. Walton are so frivolous that they border on sanctionable. Dr. Walton is clearly entitled to summary judgment in her favor.

William Barnett

Defendant William Barnett was Princola's group therapy leader beginning on May 12, 2015 at the IWP. Plaintiff claims that Mr. Barnett is liable for failing to effectuate the IWP's suicide policy on the day of Princola's suicide. However, Mr. Barnett was a behavioral health specialist and his responsibilities were limited to leading group therapy sessions and facilitating discussions in those groups. He is not a licensed medical professional and, as such, had no duty or authority to conduct mental health examinations. There is no evidence that Mr. Barnett was even present at the IWP on

September 21, 2015.  At most, if he had concerns about a patient based on an interaction that he observed during a therapy session, he would report those concerns to the psychologist.  Plaintiff has adduced no evidence to establish that Mr. Barnett somehow administered his group therapy sessions in a way that violated Princola's constitutional rights or otherwise failed to report her suicidal behavior to the appropriate mental health professionals.  For these reasons, he is entitled to summary judgment in his favor.

Debbie Durham, Keisha Hamer-Harris, and Shonda Simon

Defendants Debbie Durham, Keisha Hamer-Harris, and Shonda Simon are all nurses at the IWP, who treated Princola at various times throughout her incarceration, all prior to September 21, 2015.  There is no evidence that any of these three was present at the IWP on the day of Princola's suicide, much less that any was aware she was being placed in restrictive housing at that time and thus in need of a mental health screening.  Accordingly, none of them can be held responsible for failing to provide Princola a mental health examination prior to her transfer to restrictive housing on September 21, 2015 or otherwise failing to abide by suicide prevention protocols on that day.

Nor has Plaintiff adduced any evidence to establish that the care these nurses provided to Princola before the date of her suicide was in any way deliberately indifferent.

- Nurse Hamer-Harris: The only treatment Nurse Hamer-Harris provided Princola was on June 21–22, 2015, while Princola was on suicide watch.  Nurse Hamer-Harris monitored Princola and performed a mental status checklist at each assessment.  All findings were normal and during these visits Princola denied

37

wanting to harm herself or others and reported no physical health issues.  Nurse Hamer-Harris had no further involvement with Princola's treatment after June 22, 2015, three months before Princola's suicide.

- Nurse Durham: It is true, as Plaintiff argues, that Nurse Durham had cleared Princola for housing in a segregation unit on occasions prior to September 21, 2015, despite having direct knowledge of Princola's prior suicide attempts.  But there is no evidence that those prior placements caused Princola any constitutional injury, and, as noted above, Nurse Durham never cleared Princola to be placed in restrictive housing immediately prior to or on the date of her suicide.  In fact, Nurse Dunham had no knowledge that Princola was being placed in restrictive housing that day.

- Nurse Simon: Nurse Simon was the last nurse to see Princola before September 21, 2015.  Nurse Simon evaluated Princola on September 20, 2015 based on Princola's complaints regarding her stool and constipation.  Plaintiff claims that Nurse Simon is liable based on her failure to inquire into Princola's mental status on that date and failure to ensure that suicide prevention protocols were followed.  However, Princola was not being seen on that date for mental health issues nor did Nurse Simon observe anything in her behavior indicating that she was in mental distress at that time.  To the contrary, Nurse Simon testified that Princola appeared to be in a good and happy mood that day.

Based on this evidence, no reasonable jury could find deliberate indifference on the part of any of these three defendants.

Talitha Moschell-German

For similar reasons, Defendant Talitha Moschell-German is also entitled to summary judgment. Although Nurse Moschell-German was at the IWP on September 21, 2015 and was scheduled to see Princola that day to follow up on Princola's complaints of constipation, Princola's medical emergency unfolded before she was seen by Nurse Moschell-German. In fact, Nurse Moschell-German was not informed at any point on September 21, 2015 that Princola was being placed in restricted housing nor is there evidence that she had independent knowledge of that fact; thus, there is no evidence on the basis of which she could be found deliberately indifferent for having failed to provide a mental health screening on that date. Nurse Moschell-German was also not involved with the care provided to Princola following the Signal 3000. Nor has Plaintiff adduced evidence from which a reasonable jury could find that Nurse Moschell-German exhibited deliberate indifference toward Princola at any time prior to September 21, 2015. Nurse Moschell-German had seen Princola most recently on September 17, 2015, in response to her complaint of neck pain. There is no evidence that Princola exhibited behavior on that date which raised any concerns regarding her mental health. The claims against Nurse Moschell-German will also be dismissed.

The Remaining Medical Defendants

With regard to the remaining Medical Defendants, the gravamen of Plaintiff's argument is that each was deliberately indifferent to Princola's substantial risk of suicide either because they failed to properly classify her mental health status prior to September 21, 2015 and/or they failed to administer her a medical screening before she entered

restrictive housing on that date. For the following reasons, neither of these theories supports a finding of liability on the part of any of the Medical Defendants.

Plaintiff argues that by improperly classifying Princola's mental health status at various times prior to September 21, 2015, <u>Defendants James Sackett, Vicki Burdine, and Daniel Prober</u> were deliberately indifferent to her serious medical needs. We understand Plaintiff's argument to be that, had Princola been properly classified, she would have automatically been subject to a suicide screening and fifteen-minute monitoring on September 21, 2015, or, at least, that there would have been a heightened awareness among the Medical and IDOC Defendants regarding the seriousness of her mental health issues.

The evidence establishes, however, that mental health status classification does not affect an inmate's course of treatment, observation level, or the decision whether to place an offender on or off suicide watch. Rather, the classification system affects only the institution at which an inmate is housed. For example, an inmate classified as a "C" could be housed at facilities with fewer available mental health services than an inmate classified as a "D" or "E." Princola was already housed at the IWP, which is able to house all offenders, regardless of their classifications, due to the signficant mental health treatment resources available within the facility. Thus, even if Drs. Sackett, Burdine, and Prober had classified Princola as Plaintiff contends was necessary, she would not have been treated any differently with regard to her placement in the RSHU, nor would she have received any additional supervision or mental health treatment based on that classification.

Additionally, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. Rather, a plaintiff must adduce enough facts to demonstrate a reasonable inference of deliberate indifference from the doctors' treatment decisions. "[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). Plaintiff has not established that the classifications made by Drs. Sackett, Burdine, or Prober were so erroneous so as to be a substantial departure from accepted professional standards as to constitute deliberate indifference.

Similarly, the evidence adduced by Plaintiff is insufficient to establish deliberate indifference on the part of Dr. Prober for his decision to remove Princola from suicide watch on August 13, 2015, or, for that matter, on any prior occasion. Each time that Dr. Prober was informed that Princola had made a suicide attempt or had engaged in talk of self-harm, he and the medical staff took appropriate action by placing her on suicide watch. At times, he kept her on close observation over her protests because of his concerns that she was still a risk to herself. On August 11, 2015, Dr. Prober again placed Princola on suicide watch following her suicide attempt while in segregation. While on suicide watch, she was monitored at fifteen-minute intervals by corrections staff. On August 13, 2015, Dr. Prober reviewed the observation reports made by the officers and

directly observed Princola himself. At that time, she denied suicidal ideation and agreed to refrain from self-harm. Following his meeting with Princola, Dr. Prober determined in his medical judgment that she should be removed from suicide watch.

Based on these facts, there is no basis on which to conclude that the risk of removing Princola from suicide watch on August 13, 2015 would result in her suicide nearly forty days later was such that Dr. Prober's decision can be deemed to have been deliberately indifferent. The evidence before us establishes that inmates at the IWP were kept on suicide watch for longer than thirty days only in exceptional circumstances. Gipson Dep. at 80. The Seventh Circuit has recognized that, "[w]hen faced with treatment of an individual in state custody, a medical professional must consider conflicting rights." *Id.* at 262. If an inmate is placed in more restrictive conditions than the general prison population, like, for example, when on suicide watch, her constitutional rights may be violated, "if the more restrictive conditions are particularly harsh compared to ordinary prison life or if [s]he remains subject to those conditions for a significantly long time." *Early v. Racine Cnty. Jail*, 718 F.3d 689, 691 (7th Cir. 2013). In other words, inmates have "a right to be free from restraint, but this right [is] not absolute; it end[s] at the point at which [her] freedom of restraint pose[s] the substantial risk that [she] would seriously injure or kill [herself]." *Pardue*, 94 F.3d at 262. "Where these rights intersect is a matter of medical judgment." *Id.* Here, Dr. Prober exercised his medical judgment in determining that Princola's mental health had improved as of August 13, 2015 to a point at which she no longer needed to be on suicide watch. There is no evidence that such a conclusion was in any way outside the bounds of accepted

professional judgment, much less so as to be deemed deliberately indifferent to Princola's serious medical needs.

Plaintiff has adduced no evidence to support an inference that any of the remaining Medical Defendants, including Drs. Prober, Sackett, and Burdine, as well as Defendants Julie Murphy, Janet Cuffel, and Pam Kirkwood, was aware that Princola was being placed in restrictive housing or a holding cell on September 21, 2015. The undisputed evidence is that no member of the medical or mental health staff was informed of that fact, despite IDOC policy requiring such notification so that a suicide screening can be performed before any inmate is placed in segregation. Plaintiff's own expert, Paul Adler, D.O., averred that, pursuant to the IWP's regulations and per the "Mental Health Services Plan" set forth in IDOC's Health Care Service Directives, "[h]ealth service staff must be informed immediately when offender is assigned to segregation," but that, when Princola was placed in the RSHU on September 21, 2015, "[t]hey were not informed!" Adler Aff. ¶ 12.

Nor has Plaintiff adduced any evidence that any of these defendants had independent knowledge of Princola's placement in the RSHU on that date or that they intentionally turned a blind eye to evidence that she had been so placed. At most, Plaintiff argues that Nurse Kirkwood was "on the unit" when Princola was transferred to the RSHU, but the undisputed evidence is that Nurse Kirkwood was not alerted to the fact that Princola had been transferred and there is no evidence that her duties would otherwise have put her in contact with Princola on that day such that a reasonable jury could infer she knew that Princola was in the holding cell. Without such knowledge,

none of the Medical Defendants can be found to have been deliberately indifferent on grounds that they failed to provide Princola a mental health screening or to follow suicide prevention protocols prior to her entering the RSHU on September 21, 2015.[10]

Thus, Plaintiff's only remaining potentially viable legal theory is that the Medical Defendants involved with Princola's care following the Signal 3000 call—Nurse Kirkwood, Ms. Murphy, Nurse Cuffel, and Dr. Sackett—exhibited deliberate indifference in the manner they provided such care.  We address the particular facts as to each of these Medical Defendants in turn below.

Pam Kirkwood

Plaintiff argues that Nurse Kirkwood was deliberately indifferent in failing to call 911 and incorrectly performing CPR.  The uncontroverted evidence establishes that Nurse Kirkwood was on her way back from the infirmary when she became aware of the Signal 3000.  She was one of the first responders to the scene and immediately assisted corrections staff in getting Princola down from the sheet on which she was hanging and began performing CPR.  While she was conducting CPR, she yelled out several times to the custody officer on duty at the desk for someone to call 911.  Given that Nurse Kirkwood was attempting life-saving measures at the time, no reasonable jury could find that, by instructing another person who was not engaged in such measures to call 911 as

_____

[10] While breakdowns in the notification system between the custody and medical staffs regarding transfers to segregation do not support an independent constitutional claim here, such evidence might under certain circumstances support a claim of institutional deliberate indifference, which is addressed in more detail with reference to Plaintiff's *Monell* claim against Corizon.

opposed to stopping CPR to make the call herself, her behavior constituted deliberate indifference to Princola's serious medical needs.

We reach the same conclusion as to Plaintiff's claim that Nurse Kirkwood's effort to perform CPR evidences deliberate indifference. Specifically, Plaintiff argues that those who performed CPR on Princola, including Nurse Kirkwood, improperly did so, causing lacerations to Princola's liver resulting in severe blood loss that ultimately contributed to her death. Putting aside the question of whether the large amount of fluid found in her abdomen both contributed to her death and was in fact blood that came from liver lacerations caused by improperly performed CPR, we find that any problems in Nurse Kirkwood's implementation of CPR at most constituted negligence and in no way rises to the level of an Eighth Amendment violation. *See Lyday v. St. Anthony Hosp.*, No. 3:08-cv-0479, 2009 WL 77529, at *3 (N.D. Ind. Jan. 12, 2009) ("Negligence, medical malpractice, and incompetence do not constitute deliberate indifference ….") (citing *Estelle*, 429 U.S. at 106; *Walker v. Peters*, 233 F.3d 494 (7th Cir. 2000)). The parties have not cited nor have we found a case in which individuals, medical providers or otherwise, were found deliberately indifferent based on the improper administration of CPR. Accordingly, Nurse Kirkwood is entitled to summary judgment.

Julie Murphy

Plaintiff claims that, like Nurse Kirkwood, Ms. Murphy was deliberately indifferent in failing to contact 911 and by performing CPR in such a way that caused liver lacerations. As discussed with reference to Nurse Kirkwood, even assuming that CPR was performed improperly, such a failure does not constitute deliberate indifference.

However, we find that genuine issues of material fact exist precluding summary judgment for either side on the question of whether Ms. Murphy's failure to call 911 was deliberately indifferent.  It is undisputed that Ms. Murphy received a call from Captain Wilson who stated that Nurse Kirkwood wanted 911 called.  Ms. Murphy and Captain Wilson have given conflicting testimony regarding what was said next.  According to Captain Wilson, Ms. Murphy responded, "okay," and hung up the telephone, leading Wilson to believe that Murphy was making the call.  Ms. Murphy, on the other hand, avers that, because Officer Wilson had not provided her any information regarding the nature of the emergency, she would not have known what to tell the 911 operator, and so she instructed Captain Wilson to call for emergency services by responding, "Okay.  Call them."  Murphy Aff. ¶ 3.

If a jury believes Captain Wilson's testimony and concludes that, upon being told that Nurse Kirkwood needed emergency services called, Ms. Murphy simply responded, "okay," and disconnected the line without inquiring further as to the nature of the emergency or otherwise explicitly confirming who was going to make the call, thereby turning a blind eye to Princola's serious medical needs, a reasonable juror could infer deliberate indifference.  This is particularly true given that Health Care Services Directive 4.06, implemented on November 1, 2010, calls for corrections staff to first contact the nursing staff in the event of a suicide attempt.  The policy goes on to provide that, "*[w]hen no nurse is on duty*, [corrections staff] must contact 911 and access external emergency medical services."  Dkt. 219-3, Bates No. 1182 (emphasis added).  Further, the evidence establishes that corrections officers, including Captain Wilson, were

prohibited from carrying cell phones and the telephones in the housing units could not complete calls outside the prison. It is not clear from the record whether Ms. Murphy knew whether Captain Wilson was calling on an internal or external line, and thus, whether Wilson even had the ability to make the 911 call from the phone she was using. Because there are genuine issues of material fact which are bound up in credibility determinations summary judgment is not available for either party. Thus, this claim against Ms. Murphy survives.[11]

Janet Cuffel

Plaintiff claims that Nurse Cuffel's delay in arriving at the scene and failure to ensure that CPR was performed correctly evidences deliberate indifference. Plaintiff argues that there was a 24-minute delay in Nurse Cuffel arriving at the scene. Plaintiff measures that delay from the time that Princola was first found around 3:14 p.m. The Signal 3000 did not go out until 3:17 p.m. and it is not clear when Ms. Murphy relayed this information to Nurse Cuffel. However, based on the timeline summary from the video footage submitted by Plaintiff, Nurse Cuffel arrived at the scene with Ms. Murphy at 3:28 pm. and already had an oxygen tank with her. Even assuming that Nurse Cuffel was immediately made aware of the Signal 3000 call, the delay in her arrival was no

---

[11] We note that Plaintiff will have a steep hill to climb in proving deliberate indifference on these facts as there are numerous inferences a reasonable jury could draw from this evidence that would not support a finding that Ms. Murphy acted intentionally in failing to call 911. For example, a reasonable jury could conclude that Captain Wilson simply misheard Ms. Murphy or that Ms. Murphy honestly believed that Captain Wilson was calling emergency services and that it was nothing more than a tragic mix-up. Untangling the factual disputes and making credibility determinations is the job of the fact finder, however, and we cannot make those findings on summary judgment.

more than eleven minutes, according to Plaintiff's evidence. Within those eleven minutes, Nurse Cuffel had also procured the oxygen tank to take to the scene in case it was needed for the medical emergency. Moreover, the evidence establishes that, once she arrived on the scene, she did not perform CPR on Princola (as others were already doing so) but instead left to retrieve a replacement oxygen tank in case it was needed as she had noticed that the original tank she had procured did not have a sufficient supply. Upon her return to the scene, Nurse Cuffel realized that emergency services should have already responded and then immediately took Ms. Murphy's cell phone and called 911 when she discovered that the call had not yet been made. No reasonable jury could find from these actions that she was in any sense deliberately indifferent to Princola's serious medical needs and is therefore entitled to summary judgment in her favor.

<u>James Sackett</u>

Dr. Sackett likewise is entitled to summary judgment. Plaintiff claims that Dr. Sackett was delayed in responding to the Signal 3000, improperly performed CPR, and failed to ensure that 911 had been called. It is not entirely clear when Dr. Sackett arrived at the scene as there is evidence that he arrived at the same time as Ms. Murphy and Nurse Cuffel (around 3:28 p.m.), but in his affidavit, he avers that he arrived at 3:32 p.m. Regardless, at most, this is a 15-minute delay between the time he was informed of the Signal 3000 and when he arrived on the scene. Even assuming such a delay could be considered deliberate indifference, no reasonable jury could find that such a delay caused Princola constitutional injury as she was already being tended to by first responders at the time and, upon his arrival, Dr. Sackett did nothing more than was already being done for

her because he did not need to. The evidence establishes that when he arrived, he immediately joined efforts to revive Princola by performing CPR as well as attempting to start an IV. Any failure to properly perform CPR or failure to ensure upon arrival that 911 had been called is insufficient to establish an Eighth Amendment violation.

### ii.    IDOC Defendants

Plaintiff claims that the IDOC Defendants were deliberately indifferent toward Princola's serious medical needs by failing to contact the medical staff to alert them to her transfer to the RSHU so that a mental health screening could be performed, failing to follow IDOC's suicide prevention protocols while Princola was in the RSHU holding cell, improperly performing CPR and/or failing to call emergency services. As with the Medical Defendants, there are a few claims against IDOC Defendants that can be disposed of in short order. We turn first to address each of these defendants.

Rebecca Witter

The only contact Sgt. Witter had with Princola at the IWP was on July 23, 2015 when Sgt. Witter received information that Princola had made statements about wanting to harm herself. Pursuant to IDOC policy, Sgt. Witter notified MHP Leslie Weaver about those statements and Ms. Weaver met with Princola that same day. On the day of Princola's suicide, Sgt. Witter was not present at the IWP as she was on maternity leave. No reasonable jury could find that she was deliberately indifferent to Princola's serious medical needs on these facts and any argument that Plaintiff puts forth otherwise is preposterous. Sgt. Witter is clearly entitled to summary judgment.

Janet O'Neal

Defendant Janet O'Neal is also entitled to summary judgment on the claims against her. Ms. Neal is a Classification Analyst at the IWP and was the Supervisor of Classification during the relevant time period. The undisputed evidence is that Ms. O'Neal had no role in housing placement for offenders at the IWP as those decisions were made by the mental health staff and, as discussed above, did not constitute deliberate indifference. She had no knowledge of Princola's transfer to the RSHU on September 21, 2015, was not present at the RSHU when Princola committed suicide, and had no role in the responsive efforts. No reasonable jury could find that these facts establish that Ms. O'Neal exhibited deliberate indifference towards Princola's serious medical needs.

Steven McCauley

Plaintiff puts forth a cursory argument that Superintendent McCauley exhibited deliberate indifference to Princola's serious medical needs when he directed custody staff to take her to the RSHU on September 21, 2015 after she exhibited behavior toward him that he found disrespectful.[12] There is insufficient evidence from which a reasonable jury could conclude that Superintendent McCauley had any subjective knowledge of a substantial risk that Princola would commit suicide. Princola was not exhibiting signs of mental distress when he directed that she be sent to the RSHU. Moreover, there is no

_____

[12] Plaintiff also claims that Superintendent McCauley adopted a policy and practice of placing inmates in the shower stall with a bed sheet prior to transport to the RSHU as well as a practice of ignoring the suicide prevention procedures, both of which resulted in constitutional injury in this case. Because this is an official capacity claim, we resolve it below in our discussion of the claims brought against the institutional defendants.

evidence that, when he sent Princola to the RSHU, Superintendent McCauley directed custody staff to disregard the IWP's policies and procedures related to a transfer to the RSHU, the disregard of which is what Plaintiff alleges caused Princola's constitutional injury. Accordingly, we hold that no reasonable jury could find Superintendent McCauley deliberately indifferent based solely on the fact that he sent her to the RSHU for an alleged disciplinary infraction.

Danielle Katterhenry, Deja Lewis, and David Walker

Plaintiffs' claims against Danielle Katterhenry, Deja Lewis, and David Walker also fail. There is no evidence that any of these three defendants was aware of Princola's transfer to the RSHU on September 21, 2015, or was present at the RSHU before her suicide on that day. Officers Katterhenry and Lewis both responded to the Signal 3000 as part of the Quick Response Team and assisted in lifting Princola's body so that the bed sheet could be removed from her neck and then in lowering her to the ground once it was removed. Officer Walker arrived on the scene while this was occurring and observed custody staff lowering Princola's body to the ground and then saw Sgt. Todd begin CPR. Officer Katterhenry left to retrieve the defibrillator and went to the entrance of the RSHU to meet the medical staff. Neither Officer Lewis nor Officer Walker had any further involvement in the responsive efforts as those were carried out by others.

Plaintiff argues that these three defendants should be found deliberately indifferent because they had a general awareness that Princola had previously attempted suicide, "[a]ll facility staff are required by policy to be cognizant of increased suicide risk while on duty," and "[s]uicide prevention is the responsibility of all Facility Staff." Dkt. 220 at

51

42–43.  Without knowledge that Princola was in the RSHU and that IDOC's suicide prevention policies were not being followed, however, none of these defendants could have had the requisite subjective awareness of any imminent threat to Princola's serious medical needs.  Nor is there any indication that they were deliberately indifferent in their responsive efforts.  Accordingly, they are each entitled to summary judgment.

Keith Ray, Michael Wilkerson, and Bonnie Russell

Similarly, even viewing the facts in the light most favorable to Plaintiff, there is insufficient evidence in the record from which a reasonable jury could conclude that Jessica Jonas, Keith Ray, Michael Wilkerson, and Bonnie Russell were subjectively aware on September 21, 2015 that Princola was at a substantial risk of suicide or that they were deliberately indifferent to such a risk.  Officer Jonas concedes that she had general knowledge that Princola had received care and treatment from mental health staff prior to September 21, 2015, and that, in her role as a first responder, she had specific knowledge of Princola's August 11, 2015 suicide attempt.  Although Officer Ray, Captain Wilkerson, and Sgt. Russell all deny having any knowledge of Princola's mental health conditions or prior suicide attempts, at most, a jury might be able to infer that they had to have at least some knowledge of Princola's general mental health condition given the number of times she had previously been sent to the RSHU and placed on suicide watch during her incarceration.

Even if they had knowledge of Princola's past history, however, that is insufficient to establish their subjective awareness of a substantial risk of suicide on September 21, 2015.  None of these individuals heard Princola make statements or observed any

behavior that day that they found concerning or that would suggest she was at risk of self-harm. Moreover, there is no evidence that any of these defendants was aware that IDOC's procedures had not been followed with regard to Princola's transfer to the RSHU such that they could have been aware of any risk to her health or safety on that basis. Once Princola was discovered, Officers Ray and Jonas responded to the medical emergency with haste and assisted in helping to lift Princola's body so the bed sheet could be cut from her neck and in lowering her to the ground so that others could begin CPR. On these facts, no reasonable jury could find that any of these four defendants exhibited deliberate indifference toward Princola's serious medical needs.

Sonya Johnson

Officer Johnson was on duty at the RSHU when Princola was transferred in and therefore had knowledge that Princola had been placed in the shower stall holding cell. Plaintiff claims that her failure to contact the mental health staff to alert them that Princola needed a mental health screening, failure to conduct a strip search of Princola, and failure to perform a visual check every fifteen minutes despite knowing of her prior suicide attempts constituted deliberate indifference. Officer Johnson concedes that, although she was not aware of Princola's specific mental health conditions, she did have a general awareness that Princola had attempted suicide in the past. There is no evidence, however, that Officer Johnson had any encounter with Princola on September 21, 2015 that a reasonable juror could find would have put her on notice that Princola was at imminent risk of committing suicide at that time. Without such subjective knowledge,

Officer Johnson cannot be found to have been deliberately indifferent toward Princola's serious medical needs.

<u>Nicole Wilson</u>

Plaintiff claims that Captain Wilson was deliberately indifferent in failing to ensure suicide prevention policies were followed on September 21, 2015, despite having knowledge of Princola's prior suicide attempts, and by failing to contact 911. We address these arguments in turn.

Genuine issues of material fact exist regarding Captain Wilson's subjective knowledge of Princola's mental health history and prior suicide attempts. Captain Wilson testified that, on September 21, 2015, she had no knowledge of Princola's prior suicide attempts. However, she concedes that, in her supervisory role, the Signal 3000 calls came through her, and thus, if she was on duty on the days of those prior attempts, she would have been the recipient of those calls. Wilson Dep. at 71. Plaintiff claims that she was in fact on duty on those dates and received the Signal 3000 calls but provides no evidence to support that conclusion; thus, the record is undeveloped on this point. Captain Wilson also testified that, in her position as a captain, she would have reviewed documentation related to those prior suicide attempts, but that she has no independent knowledge or recollection of those incidents. *Id.* at 73–74.

The Supreme Court and Seventh Circuit have held that "[i]f the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit the trier of fact to find that the defendant official had actual

54

knowledge of the risk." *Sanville v. McCaughtry*, 266 F.3d 724, 737 (quoting *Farmer v, Brennan*, 511 U.S. 825, 842 (1994).  Although a close question, there is sufficient evidence from which a jury could find that, based on her official position, Captain Wilson must have had subjective knowledge of Princola's prior suicide attempts, including the fact that both prior attempts involved the use of a bed sheet.

Knowledge of prior suicide attempts alone, however, is not sufficient to establish that Captain Wilson had a subjective awareness of a substantial risk that Princola would commit suicide on September 21, 2015.  At most, the evidence establishes that Captain Wilson twice observed Princola "screaming loudly" while in the shower holding cell as Wilson made her rounds that day.  Given that Princola had been transferred to the RSHU not for any mental health concerns, but because of a disciplinary issue, that Captain Wilson had not heard her threaten to harm herself or indicate that she was having suicidal thoughts, and that it was not uncommon for offenders to yell and scream while in segregation, no reasonable jury could find that Captain Wilson was subjectively aware on September 21, 2015 of an imminent and substantial risk that Princola would commit suicide.  Accordingly, Captain Wilson is entitled to summary judgment on this theory.

We find, however, that genuine issues of material fact exist precluding summary judgment for either party on the question of whether Captain Wilson's failure to call 911 was deliberately indifferent.  It is undisputed that Captain Wilson called Ms. Murphy and stated that Nurse Kirkwood wanted 911 called.  As discussed above, Ms. Murphy and Captain Wilson have given conflicting testimony regarding what was said next. According to Captain Wilson, Ms. Murphy responded, "okay," and hung up the

telephone, leading Wilson to believe that Murphy was making the call.  Ms. Murphy, on the other hand, avers that, because Officer Wilson had not provided her any information regarding the nature of the emergency, she would not have known what to tell the 911 operator, and so she instructed Captain Wilson to call for emergency services by responding, "Okay.  Call them."  Murphy Aff. ¶ 3.

If a jury were to believe Ms. Murphy's testimony and concludes that, upon being told that Nurse Kirkwood needed emergency services called, she explicitly instructed Captain Wilson to call 911 and Captain Wilson chose not to do so, despite having knowledge of the graveness of the situation, a reasonable juror could infer deliberate indifference.  *See Mathison v. Moats*, 812 F.3d 594, 598 (7th Cir. 2016) (deliberate indifference could be inferred from the failure to call 911 when the prison official believed that the inmate was having a heart attack).  Captain Wilson concedes that she could have called 911 and claims that she only failed to do so because she mistakenly believed that Ms. Murphy was making the call.  Resolving the questions of what was said and whether Captain Wilson's claim that it was merely a mistake as opposed to a deliberate choice that she failed to make the call, requires credibility determinations that cannot be made at the summary judgment stage.  Because genuine issues of material fact preclude summary judgment for either party, this claim against Captain Wilson survives.

Renee Todd

We find, for the same reasons discussed with reference to Captain Wilson, that, even when viewed in the light most favorable to Plaintiff, the facts cannot support a finding that Sgt. Todd was aware that Princola presented a substantial suicide risk on

September 21, 2015.  Sgt. Todd knew that Princola was transferred to the RSHU that day for a disciplinary infraction, not a mental health issue.  Although Princola was upset and crying about being put in "lock" because she was worried it would affect her release date and anger her grandmother, Sgt. Todd stayed with Princola and reassured her until she was calm.  By the time Sgt. Todd was called away to another unit, Princola told Sgt. Todd that she was okay and that Sgt. Todd should respond to the other call.  Although Sgt. Todd had responded to Princola's August 11, 2015 suicide attempt and thus knew that Princola had recently attempted suicide with a bed sheet, on September 21, 2015, Princola never threatened to engage in self-harm or otherwise indicated to Sgt. Todd that she was suicidal at that time.  Accordingly, there is no evidence that would support a finding that Sgt. Todd intentionally disregarded an obvious danger that Princola would harm herself on September 21, 2015, and thus, Sgt. Todd is entitled to summary judgment on this claim.

For the same reasons discussed above with reference to the Medical Defendants, Sgt. Todd is also entitled to summary judgment on Plaintiff's claim that the manner in which she performed CPR was deliberately indifferent.

### B.    Institutional Defendants

In addition to its claims against the individual defendants, Plaintiff also brings a *Monell* claim against IDOC and Corizon.  Corizon is a private corporation that acts under color of state law by contracting to perform a government function, i.e., providing medical care to correctional facilities.  As such, Corizon is treated as a government entity for purposes of claims brought pursuant to § 1983.  It is well-established that there is no

respondeat superior liability under § 1983. *See Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 619-20 (7th Cir. 2001). A "private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (citations omitted). Rather, to maintain a viable § 1983 action against a governmental entity or agent, "a plaintiff must demonstrate that a constitutional deprivation occurred as the result of an express policy or custom promulgated by that entity or an individual with policymaking authority." *Gayton v. McCoy*, 593 F.3d 610, 622 (7th Cir. 2010) (citing *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001)). We address Plaintiff's claims against Corizon and IDOC in turn below.

i.   **Corizon**

Plaintiff asserts that, based on a deliberate practice, Corizon had "no set policy[] as to who was to call 911 in the case of an emergency, or a practice of coordination between Custody and Corizon staff, to enforce the policy of requiring suicide screens for anyone held in shower stalls prior to being transported to the RSHU." Dkt. 239 at 25. For the reasons detailed below, Corizon is entitled to summary judgment on this claim.

In support of its claim against Corizon, Plaintiff cites the Seventh Circuit's recent *en banc* opinion in *Glisson v. Ind. Dep't of Corrections*, 849 F.3d 372 (7th Cir. 2017), a case involving a deliberate indifference *Monell* claim brought by the estate of Mr. Glisson, a chronically ill inmate who died while in custody. In *Glisson*, the plaintiff claimed that Corizon, the prison medical provider, caused Mr. Glisson to receive constitutionally deficient care for his complex medical issues because it failed to have a

medical coordination policy in place which resulted in, *inter alia*, a lack of a

comprehensive treatment plan to address his chronic care needs. *Id.* 375–76. The court

held that a reasonable jury could infer that Corizon made a deliberate decision not to have

such a policy because it was aware of, but declined to adopt, certain IDOC guidelines

which specifically mandated a treatment plan for cases involving chronic medical issues.

*Id.* at 380. The court further held that, based on this evidence, a jury could find that

Corizon was deliberately indifferent to an "obvious" need for protocols for treating

chronically ill inmates. *Id.* at 382.

We agree with Plaintiff that, as with the obviousness of the risk at issue in *Glisson*,

"[o]ne does not need to be an expert," *id.*, to know that failing to provide offenders a

mental health or suicide screening before transferring them to segregation and/or failing

to have clear direction as to the procedures for contacting emergency services in the event

of a medical emergency is likely to result in constitutional violations. The evidence

before us, however, is that there *were* policies in place intended to prevent such

constitutional harm but that those procedures were not followed by various individual

defendants in this case. Thus, Plaintiff has presented no evidence that Corizon

consciously chose not to adopt a policy that might prevent inmates from being placed in

segregation without having been provided a mental health screening or confusion

between the medical and custody staffs regarding responsibility for contacting emergency

services. Nor is there sufficient evidence from which a reasonable jury could conclude

that Corizon was aware that the procedures in place requiring custody staff to contact

medical staff in order to provide the required mental health screening and setting forth the

procedures for contacting emergency services were either causing inmates harm or were likely to cause harm in the future.

As the *Glisson* Court made clear, "[t]he critical question under *Monell* … is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Ind. Dep't of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017). Here, the claimed harm came not from the failure to have a policy of coordination with regard to providing mental health screening and/or contacting emergency services but rather from individual failures to follow the appropriate policies that were place. Accordingly, Corizon is entitled to summary judgment.

### ii.     IDOC and Steven McCauley

Plaintiff claims that IDOC and Steven McCauley, as an IDOC employee with policymaking authority: (1) adopted a policy and practice of placing inmates in the shower stall with a bed sheet as a shower curtain prior to transport to the RSHU; and (2) had an established practice of ignoring the policy of conducting a suicide assessment and strip search when an inmate was placed in the shower stall prior to transfer to the RSHU, both of which caused resulted in Princola's death. However, in *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989), the Supreme Court held that neither the state nor state officials acting in their official capacities were "persons" under § 1983. Plaintiff's claims against IDOC and Steven McCauley in his official capacity must therefore be dismissed.

### III.    Conclusion

For the reasons detailed above, the Medical Defendants' Motion for Summary Judgment is <u>DENIED</u> as to Plaintiff's claim against Defendant Julie Murphy and in all other respects is <u>GRANTED</u>. The IDOC Defendants' Motion for Summary Judgment is <u>DENIED</u> as to Defendant Nicole Wilson and is otherwise <u>GRANTED</u>. Plaintiffs' Motion for Summary Judgment is <u>DENIED</u>. The pending motions to exclude and/or limit expert testimony filed by the Medical and the IDOC Defendants [Dkt. Nos. 244 and 245, respectively] are <u>DENIED AS MOOT</u> with leave to refile if necessary following this ruling. The case shall proceed accordingly.

IT IS SO ORDERED.

Date: 9/30/2019

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution to counsel of record via CM/ECF